# STATE OF VERMONT

SUPERIOR COURT
Washington Unit

CIVIL DIVISION
Docket No. 299-9-20 Wncv

Intralot, Inc.,
    Plaintiff

v.

Vermont Department of Buildings,
Jennifer M.V. Fitch,
Vermont Department of Liquor,
Patrick T. Delaney,
Gary Kessler,
    Defendants

FINDINGS AND ORDER

---

Decision on Intralot's Motion for Preliminary Injunction in **No. 299-9-20 Wncv**
and Emergency Motion for Stay of Contract Award in **No. 339-10-20 Wncv**[1]

Plaintiff Intralot Inc. is the contractor that has been operating the Vermont lottery system since 2010. In 2018, the Vermont Department of Buildings and Grounds Office of Purchasing and Contracting (OPC) initiated a procurement process in preparation for the expiration of Intralot's contract. Intralot bid on the new contract but, following litigation, OPC voluntarily withdrew the request for proposals (RFP) in favor of starting over with a new procurement process. It issued a new RFP in 2020 in response to which Intralot and other competitors submitted bids.

Prior to OPC's consideration of the bids, Intralot filed an action in this court, docketed as No. 299-9-20 Wncv (the equal protection case), raising constitutional and non-constitutional claims based on what it considered to be unfairness in the way the RFP had been crafted. It sought a preliminary injunction to prevent OPC from proceeding with the procurement process until its claims could be determined. The State opposed any injunction and filed a motion to dismiss. Before the court had a chance to address either motion, OPC determined that Intralot's proposal did not comply with the RFP, and it disqualified Intralot's bid, knocking it out of the competition.

The court then granted the State's dismissal motion in the equal protection case *in part*.[2] All non-constitutional claims were dismissed. Remaining in the case are Intralot's novel class-of-one Equal Protection and Common Benefits claims. In short, Intralot claims that OPC carefully crafted the RFP to appear nondiscriminatory on its face but to actually include arbitrary and discriminatory provisions for no purpose other than to vindictively harm Intralot

---

[1] While these motions were heard together at the recent evidentiary hearing, and both are addressed in this decision, these cases have not been more fully consolidated, V.R.C.P. 42(a). The cases remain separately docketed, and counsel should refrain from making any joint filings.

[2] The State's motion to reconsider this decision remains pending.

and benefit the competing bidder for whom a consultant who helped craft the RFP had worked in the long ago past. It essentially wants the court to require OPC to engage in a third procurement process with another RFP revised to support fair competition, to which Intralot claims a right.

Intralot then filed a separate action in this court, docketed as No. 339-10-20 Wncv (the disqualification case), seeking Rule 75 review of OPC's disqualification decision. It also filed a motion in that case asking the court to stay the administrative procurement process to prevent OPC from awarding the contract until the disqualification case can be determined. At the same time, it filed a motion for a temporary restraining order (TRO), which the court granted, in the equal protection case.

The court allowed limited discovery in support of Intralot's preliminary injunction motion. Both it and the motion to stay were heard together at an evidentiary hearing on November 17 and 23, 2020. The court is mindful that the evidence presented was based on facts developed without more substantial discovery.

As a preliminary matter, the court notes for context that, in both cases, Intralot has struggled to frame a viable claim. This should not be surprising because, as the Vermont Supreme Court has specifically explained in the procurement law context:

> [T]his is an area where we must defer to an independent and separate branch of government . . . . When acting as a market participant, the government should "enjoy[ ] the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Procurement laws are for the benefit of the state, not prospective bidders.* Thus, "no one has a 'right' to sell to the government that which the government does not wish to buy."

*Hinesburg Sand & Gravel Co., Inc. v. State*, 166 Vt. 337, 343 (1997) (citations omitted; emphasis added); see also *Skaskiw v. Vermont Agency of Agric.*, 2014 VT 133, ¶ 21, 198 Vt. 187 ("Because a bidder has nothing more than a unilateral hope or expectation of securing a contract, a disappointed bidder typically has no legitimate claim of entitlement and thus no protected property interest."); *Franklin County Sheriff's Off. v. St. Albans City Police Dept.*, 2012 VT 62, ¶ 15, 192 Vt. 188 ("The Sheriff's Office . . . has no legally protected right to 'fair competition' with other statutorily created government entities to provide police services to the Town.").

Vermont has no general statutory (or regulatory) scheme permitting pre-bid or post-bid challenges to procurement processes. Vermont law does not make a potential bidder the State's partner in crafting an RFP or give the bidder any supervisory role. Thus, Intralot has attempted to locate legal bases for its challenges in the federal and Vermont constitutions in the one case and Rule 75 in the other. Yet there is no reasonably clear and authoritative body of Vermont law that would permit Intralot's claims in either case. Intralot's claims are "novel or extreme" at best. *Assn. of Haystack Prop. Owners, Inc. v. Sprague*, 145 Vt. 443, 447 (1985) (noting that "courts should be especially reluctant to dismiss on the basis of pleadings when the asserted theory of liability is novel or extreme").

2

Based on the evidence presented, the court finds and concludes as follows.

Findings of Fact

The RFP is for a valuable contract—multiple millions of dollars per year (approximately $3 million) and for a 10-year term with possible extensions. Bids were due on August 27, 2010 by 2:00 pm.

The events have taken place against the backdrop of prior litigation concerning a 2018 RFP which was deemed sufficiently defective that this court, Teachout, J., issued a preliminary injunction against the State.[3] See *Intralot v. Vermont Dep't of Bldgs. and Gen. Services*, Decision on Preliminary Injunction and Injunction, No. 193-3-19 Wncv (Vt. Super. Ct. July 9, 2019). Following that decision, the State withdrew the RFP, stipulated to the dismissal of that case, and then this year issued a revised RFP.

The evidence introduced by Intralot centered around its claims that the RFP as drafted impermissibly discriminated against it because:

(1) To evaluate the financial capacity/stability of the bidders, the RFP used the ratings the bidders had with public ratings agencies Moody's, Standard and Poor's, and Fitch as a substitute for an independent evaluation of the detailed financials required under the RFP. It argues that the use of such ratings information is not rationally tied to the objective of letting the bid out to an economically viable business.

(2) The Lottery Commission had developed animus against Intralot and deliberately included the rating agency provision in the RFP to disadvantage Intralot in the overall bidding competition since the rating results would translate to a significant overall score discrepancy which Intralot could only make up by reducing its price by $250,000 below the competition.

(3) The RFP was designed for the Lottery Commission by an individual, Herb Delahanty, who formerly worked for another of the bidders, International Games Technology (IGT), and the RFP was skewed to favor IGT or, at least, he strongly influenced the RFP terms.

Intralot has held the contract in Vermont since 2010. It services about 700–750 retailers plus about 120 scratch ticket machines. The infrastructure is spread throughout Vermont. Intralot had taken the lottery over from Scientific Games, a major player in the market. When Intralot took over, it was able to effectuate the mechanics of the transfer at all the retail outlets in about six months.

---

[3] The court notes that while Intralot relies heavily on Judge Teachout's preliminary injunction ruling in this case, that decision was based on a different RFP in a different case and is not binding in this case, which is based on a different RFP. While the decision can have persuasive value, to the extent it is persuasive, Intralot has largely relied on it as though it is independently authoritative without further analyzing its persuasive value, an ineffective approach towards its use here.

There have been no issues with Intralot having sufficient financial competence to manage the business it has in Vermont. The lottery brings in approximately $128 million in revenue and earns Intralot about three million dollars a year.

The contract is a long one by Vermont standards (10+ years) and requires special approval within the administration to award. Within the Department of Buildings and General Services is a subdivision which oversees public bidding called the Office of Purchasing and Contracting (OPC). OPC did not draft the RFP, which was developed by the Lottery Commission with assistance from a contractor, Mr. Herb Delahanty, who has an independent business advising various governmental entities with respect to lottery issues.

The State of Vermont does not have a comprehensive public bid statute. The administration has published Administrative Bulletin #3.5 (Procurement and Contracting Procedures), which is designed to assist agencies and bidders in the process of contracting with the State of Vermont. That policy document does not have the force of law. It does address public bidding, however, and in doing so the court notes the following stated goals:

> Competition in the procurement process serves both State Agencies/Departments and potential bidders by ensuring the procurement process produces an optimal solution at a reasonable price, and allowing qualified Vendors an opportunity to obtain State business. In addition to complying with existing statutory and regulatory requirements, State procurements shall comply with the following general principles:
> • **Notice**: Provide appropriate notice of opportunities to compete for State business;
> • **Predictability**: Provide a consistent process while conducting the procurement;
> • **Transparency**: Document the procurement process clearly and consistently; and
> • **Cost-effectiveness**: Ensure procurement processes are designed to secure optimal solutions at reasonable prices.

Bulletin 3.5 § VII(A).

An association of lottery entities exists called North American Association of State and Provincial Lotteries (NAASPL). It has published various templates concerning possible RFPs and contract language. Vermont belongs to NAASPL.

*Evidence of bias against Intralot*

The court finds that one of the management employees for Intralot in Vermont, Christos Tzoumaras had left the company for about 18 months, which included part of 2018 and 2019. During the time he was gone, Vermont lottery employees were experiencing problems with the service Intralot was providing and were making their frustration known. Upon Mr. Tzoumaras' return, he and his team met with a group of lottery employees on December 29, 2019. That group included both the lottery director, Gary Kessler, and a manager named Jeffery Cavender. During the meeting Mr. Cavender expressed anger toward the Intralot team around what he

4

expressed as poor service which had been negatively affecting the Vermont lottery employees. He became overwrought beyond proportion to the occasion and was physically threatening toward Intralot staff. Shortly after the outburst, Mr. Kessler apologized for his conduct. Additionally, Cavender's actions caused his dismissal from State service almost immediately. Although he did work on the 2018 RFP, he did not work on the 2020 RFP.

The court finds that there were, at that time, performance problems with Intralot, which may have had some impact on staff attitude toward Intralot staff. However, the court heard nothing about further, specific problems during the evidence. The return of Mr. Tzoumaras improved Intralot's performance. The court does not find the evidence sufficient to conclude that Mr. Cavender's conduct reflected a departmental animus toward Intralot and, further, the court does not find, as alleged, that Mr. Cavender's attitude translated to any provisions in the RFP.

Intralot alleged that Mr. Kessler had expressed specific animus toward Intralot as well. The record developed at the preliminary injunction hearing does not support that allegation.

*Financial viability*

The stated purpose of the RFP section on financial viability is "to ensure the Bidder's financial ability to perform under the contract." RFP § F.6.3.6. Intralot points to the provisions of this section as being arbitrary and capricious in application.

The RFP requires bidders to submit certified financial statements, or federal income tax returns if none, for the past two years. This may be satisfied by subsidiary statements when the Bidder does not have separate financial statements. Also, if the Bidder relies on a parent corporation, then a statement that the parent's resources are available to the bidder.

In addition to financial statements, the RFP included the following: "The bidder must provide its most recent ratings from Moody, Standard and Poor and Fitch. If a parent is serving as financial guarantor of the Bidder, the Bidder must submit the most recent ratings for the parent." RFP § F.6.3.5(D).

In assessing the financial viability of bidders, the evaluation team did not use the submitted financial statements themselves but rather used only the credit agency ratings, which the team independently retrieved from the agency at the time of evaluation. This was done to account for the possibility that there were changes in the ratings between the time of submission and evaluation. This singular point of assessment was included in the RFP procedure.

In the case of Intralot, the evaluation team used the ratings of its parent, Intralot SA, an international corporation with its principal place of business in Greece.

*Scoring*

Regarding scoring, RFP § M.2 contains an overview of the point system that the evaluators would use to score the bids. The scoring matrix concerning corporate capability is

5

made up of two scores: first is whether the bidder is operating at least two lotteries in the U.S. If so, they get 50 points, if not, they get 0. The matrix then sets out a table for scoring using the ratings from Moody's, Standard and Poor's, and Fitch. The matrix assigns points to various ratings for the various agencies as they do not all score alike. If a bidder's ratings were classified as "low risk" and received A ratings, they were assigned 50 points. The next class was for medium risk ratings which received 45 points. High risk ratings received 35 points, and the highest risk ratings received 10 points.

Intralot's ratings were identified as being the highest risk and the other two bidders' ratings were classified as high risk. That meant that they were accorded 25 more points than Intralot.

Final ratings included considerations of corporate capability, as described above, as well as points awarded for price, experience, and ability of approach and solution to achieve objectives. The maximum number of points available was nominally 2,367 points, although Intralot points out, and the court finds, that the structure for evaluating price points precluded receipt of the maximum number of points for price. The practical import of the structure was that a bidder who lost 25 points in corporate capability could make that difference up by bidding $250,000 ($10,000 per point) less than a competitor, all other things being equal.

The developers of this formula did not examine or consider the accompanying caveats from the ratings agencies. The ratings produced by the agencies are paid for by the rated entities and are designed to allow bond investors to gauge investment risk. The reports were not designed to be used in the specific fashion the RFP put them to. Additionally, there are more specific ratings for lottery companies that could have been used.

Intralot solicited evidence from an expert witness, Michael Nesser, who is a litigation support expert with a law degree who also has worked as a CPA. He reviewed the use of the ratings agency reports in the context presented here. His conclusions were that the use of the credit reports for the evaluation of long-term financial strength of a company was not a rational or reliable measure of long-term financial strength of a bidder because the purpose of those ratings was to evaluate the risk to an investor to be repaid on a debt obligation, i.e., a bond. The court does not find his use of the term "rational" to be warranted.

The court does find that the type of report Moody's produced for credit scores in the gaming industry (Exh. 51) might have been better to use than the general report actually used. An analysis of the data collected through financial statements would also have been more specific. However, even though the use the RFP made of the reports was not one contemplated by Moody's, it is not wholly irrational.

As noted in Exh. 50, which is Moody's written material and which should have been reviewed before using the ratings as a source, the ratings assigned were of the "relative credit risks of financial obligations issued by non-financial corporates . . . ." Importantly, Moody's defined credit risk as "the risk that an entity may not meet its contractual financial obligations as they come due and any estimated financial loss in the event of default or impairment." While there may well be other parts of a business's financial structure not considered by Moody's, business default on obligations, which is what Moody's concerns itself with, should be

6

of concern to other entities doing business with the rated company because short cash flow tends to trickle down to an operational level.

Mr. Nesser also concluded that the agency "arbitrarily" devalued the financial qualifications which may have been apparent through the financial statements. The evidence was that the agency did not have qualified individuals on staff to analyze the financial data presented by the bidders in the form of their financial statements and/or tax returns. The State asserts that to have done so would have required the type of subjective assessments which were criticized in the 2018 litigation. The court finds that a second level of objective criteria could have been developed to analyze financial data, and that a better analysis could have been done than was. Nonetheless, the court does not find the agency's action to be arbitrary in the legal sense.

The use of credit ratings in agency reports as a sole means to evaluate bidders' financial strength appears to be substantially unique to this RFP. The NAASPL templates do not call for such use, nor are they generally used in RFPs in the industry.

This provision appears to have emerged from the Lottery's concerns for objectivity, which stemmed back to the 2018 litigation in which Judge Teachout criticized the use of subjective criteria in the scoring formula. Mr. Kessler testified that, as well, there was an overall worry about the potential impact of the COVID pandemic on the industry, particularly those bidders who had exposure to the general gambling/gaming industry, and the ratings reports would hopefully capture solvency problems from that exposure.

Intralot would like the court to infer that using the unique ratings agency criteria in the RFP scoring process, which an evaluation of the public information concerning the bond rating would disclose would disadvantage Intralot, is evidence of malicious intent toward Intralot. The court cannot so find; nor can it conclude it is likely that Intralot will be able to prove that in such a way as to affect the bid outcomes. (Additionally, the court was not presented with any reason why Intralot could not have worked with the RFP structure as it existed and reduced its bid to account for the disadvantage.)

The internal point distinctions between bidders with different ratings are subjective. That is, why a bottom-tier rating is worth 10 points, and the next higher point evaluation is worth 35 points, is not specifically tied to any disclosed analytic framework other than the inherent value difference between a bid from a company that ostensibly is stronger than another. The court does not conclude that any legal doctrine allows the court to second guess the chosen bid criteria in the context presented.

*Litigation bond*

RFP § F.21 required a bidder to submit a litigation bond in the amount of $500,000 that would allow a claim to be made if:

1. The respondent sues the Vermont Lottery, the State of Vermont, or any of their officers [or] employees . . . with regard to any matter relating to this RFP,

7

determination of responsiveness of Bidders or the award of a contract pursuant to this RFP; and

2. The Lottery or other defendant is the prevailing party in such suit.

The purpose of the Bond is to permit the Lottery or other defendants to recover damages, including the cost of appeal relative to the additional cost in compensation to the current bidder during implementation or conversion delay, and including reasonable attorney's fees, expenses and court costs resulting from such litigation. The Litigation Bond shall remain in effect for a period of two (2) years from the date of submission of the Proposal.

Intralot did submit a litigation bond, but it included a third criterion for a claim on the bond that materially limited its utility to the State. It added:

3. The court determines that such suit or any portion thereof was frivolous, was commenced in bad faith, or was not based upon reasonable grounds.

The same bond requirement had been in the 2018 RFP, and Intralot had submitted a bond in connection with that bid that had the same third condition as the bond submitted in 2020. The bond issue did not come up in the 2018 case, however, and the State withdrew its RFP after Judge Teachout issued a preliminary injunction prohibiting aspects of it.

On October 14, 2020, Stephen Fazekas, Technology Procurement Administrator with OPC, wrote to Dimitris Maniatis of Intralot advising that the State had disqualified Intralot's proposal as materially non-compliant because of the addition to the third condition to the bond. This notice was made after this litigation had commenced. Intralot has filed a Rule 75 appeal which includes, to the extent allowable, a jury demand.

No mode of review has been specified in Vermont law for review of a bid disqualification.

During questions and answers relating to the bid process, one questioner asked whether the RFP could be amended to include such a limiting third condition. The State expressly rejected any such third condition. The questions and answers were made known to all bidders and are treated as part of the bid documents.

The directive for Mr. Fazekas to notify Intralot as to disqualification was given by Attorney Jacob Humbert, counsel for OPC, and his boss, Deborah Damore. He works, as do the defending attorneys in both current cases, for the Vermont Attorney General's office.

Mr. Fazekas had noted the litigation bond included in Intralot's submission when it came in before the end of August. He did not examine the bond for content, just that it was present.

No opportunity for cure was provided. No request to cure was made. Intralot's position is that the litigation bond required under the RFP was satisfied by its submission: that the specifics of the RFP do not make the bond language that the State asserts is necessary in fact

mandatory, and that if it is, the State has waived the requirement or otherwise should be estopped from enforcing it. Further, Intralot submits that the handling of the disqualification because of the bond language submitted is further evidence of animus toward Intralot.

The question of the scope of the bond requirement is plainly one akin to statutory interpretation. Intralot reads the requirement that the State "may" make a claim on the bond, meaning that it will have discretion as to whether to make a claim on the bond, as meaning that the terms of the bond requirement were discretionary with the bidders. The requirement cannot reasonably be read to mean that the bidder may include any conditions it likes or that it may drastically limit the State's ability to make claims on the bond. Otherwise, the requirement says the bidder "must" provide a litigation bond, and then goes on to describe its essential characteristics. Intralot simply did not submit such a bond. The point of the bond requirement was to deter procurement litigation.

As to waiver, Intralot points out that it submitted a similarly noncompliant bond in response to the previous RFP and OPC did not disqualify it on that basis. Then, when it submitted the bond in response to the current RFP, OPC accepted that its bond had been submitted without initially objecting that it was noncompliant. None of these or related arguments are predicated on any evidence that OPC ever affirmatively represented that the noncompliant bond condition was acceptable under either RFP or gave Intralot any reasonable basis to rely on any such belief.

The court finds the bond language added by Intralot was a material change to a significant term in the RFP.

*Irreparable Harm*

Intralot did not specifically introduce evidence which supports a contention that it will suffer irreparable harm if the contract is let based on the RFP as drafted sufficient to support an injunction. Intralot contends that it has sufficiently demonstrated a constitutional injury and that is all it needs to show. See *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 41, 205 Vt. 586. However, the constitutional path to success in this case is not at all clear and the evidence of animus toward Intralot which affected the design of the RFP is so circumstantial as to make it insufficient to support a preliminary injunction.

However, all other things being equal, the court does conclude that irreparable harm could occur. That is, the loss of the opportunity to bid on a valuable contract will not likely be susceptible to a remedy by damages if and when the contact is let to another entity—the court is dubious that a damages claim could be sustained on a bid disregarded.

The concept of irreparable harm is also bound up with the standing requirement in general. If the court ultimately finds that Intralot was properly disqualified because of its non-compliant bond submission, which the court concludes is likely, no irreparable harm can be said to exist.

## Conclusions of Law

The court addresses the motion for stay in the disqualification case first because the disposition of that motion informs the motion for a preliminary injunction in the equal protection case.

### Emergency Motion for Stay of Contract Award

In the disqualification case, Intralot seeks review of OPC's decision to disqualify its bid for lack of compliance with the litigation bond requirement in the RFP. It asserts in the complaint, and argues in support of a stay, that (a) the bond it provided complies with the RFP, (b) the condition claimed to have been violated was not mandatory, (c) a violation of the bond requirement cannot support disqualification, and (d) OPC should be equitably estopped from claiming otherwise or it has waived any right to disqualify on this basis. It seeks a stay pursuant to Rule 75(c) to prevent OPC from awarding the contract until these issues can be determined (OPC has indicated its intent to award the contract to Scientific Games).

The standard for granting a motion to stay is like that applicable to a preliminary injunction motion. "To prevail on a motion for stay, the moving party must demonstrate: (1) a strong likelihood of success on the merits; (2) irreparable injury if the stay is not granted; (3) the stay will not substantially harm other parties; and (4) the stay will serve the best interests of the public." *Gilbert v. Gilbert*, 163 Vt. 549, 560 (1995).

### Likelihood of success on the merits

To fairly evaluate Intralot's likelihood of success in the disqualification case, one must first consider Intralot's entitlement to review under Rule 75 and, if so, the nature of it. Neither party has done so effectively.

Intralot's complaint describes no legal basis for review whatsoever, other than by generally citing Rule 75. Nevertheless, it appears to implicitly seek some form of de novo review and expressly demands a jury trial. In its post-hearing briefing, it cites *Garbitelli v. Town of Brookfield*, 2011 VT 122, ¶ 6, 191 Vt. 76 (citations omitted) for a different standard of review: "A court reviewing governmental action is typically limited to review of questions of law. Review of evidentiary questions is limited to 'whether there is any competent evidence to justify the adjudication.'"

For its part, the State also cites *Garbitelli* as apparently representing a generally applicable standard of review under Rule 75 for agency procurement decisions. It further represents that this is the same standard in federal cases applying federal procurement law, and it goes on to apply those cases here without further consideration of their applicability. See generally the Federal Acquisition Regulations System, 48 C.F.R. §§ 1.101–9905.506-63.

Rule 75 does not provide any generally applicable standard of review for agency procurement decisions, and it is not a roving writ reflexively authorizing such review. Nor does Rule 75 simply authorize review in any case where review is not otherwise authorized. *Rule 75 is not a legal claim.* Rather, the rule sets forth the procedure used for review of governmental

10

action that is not reviewable under Rule 74 (typically, statutorily authorized review) but that is "otherwise available by law." V.R.C.P. 75(a). If statutory review or other legal claims are not available, review is typically only otherwise available "as a matter of general law by proceedings in the nature of certiorari, mandamus, or prohibition." V.R.C.P. 75—Reporter's Notes; see also Vt. R. Civ. P. 81(b) (abolishing certain extraordinary writs). On this issue, the federal law relied upon by the State provides no useful analogy to Rule 75 and whether Intralot is entitled to review in this case.

Neither party has expressly considered Intralot's *entitlement* to review in the disqualification case, though both rely on *Garbitelli* for a standard of review. *Garbitelli* sets forth the standard applicable to review in the nature of certiorari *where such review is available*. As it might apply here, certiorari provides a limited form of review of quasi-judicial functions exercised by lower tribunals. *Rhodes v. Town of Woodstock*, 132 Vt. 323, 323–25 (1974); *Burton v. Selectmen, Town of Springfield*, 124 Vt. 502, 504 (1965) ("The office of the writ of certiorari is to provide for a review of the judicial action of inferior courts . . . exercising judicial functions."). A quasi-judicial action "is one in which all parties are as a matter of right entitled to notice and to a hearing, with the opportunity afforded to present evidence under judicial forms of procedure; and that no one deprived of such rights is bound by the action taken." *Goddard v. City of Albany*, 684 S.E.2d 635, 638 (Ga. 2009); see also *Frawley v. Police Com'r of Cambridge*, 46 N.E.3d 504, 514 (Mass. 2016) ("[W]hen assessing whether a proceeding is quasi-judicial, 'we have looked to the form of the proceeding . . . and the extent to which that proceeding resembles judicial action.'" (citation omitted)).

The court fails to see how OPC's disqualification decision, or review of bids more generally, could reasonably be viewed as quasi-judicial in nature. Intralot submitted its proposal and OPC reviewed it, determined that it failed to meet RFP requirements, and disqualified it on that basis. It exercised no quasi-judicial function in doing so and used no judicial-type procedures. There is no apparent basis for certiorari review in this case.

No other bases for Rule 75 review are obvious. There is no apparent basis for review in the nature of mandamus. "A court can issue a writ of mandamus . . . only under certain circumstances: (1) the petitioner must have a clear and certain right to the action sought by the request for a writ; (2) the writ must be for the enforcement of ministerial duties, but not for review of the performance of official acts that involve the exercise of the official's judgment or discretion; and (3) there must be no other adequate remedy at law." *Petition of Fairchild*, 159 Vt. 125, 130 (1992).

Intralot has not identified any "clear and certain right to the action sought by the request for a writ." Mandamus must be predicated on such a right. *Skiff v. South Burlington School District*, 2018 VT 117, ¶ 25, 208 Vt. 564; *Wool v. Menard*, 2018 VT 23, ¶ 18, 207 Vt. 25; *Petition of Fairchild*, 159 Vt. 125, 130 (1992). It is further unclear how the substance of OPC's review of complex proposals in response to a complex RFP could possibly be considered a ministerial duty. See *Bargman v. Brewer*, 142 Vt. 367, 369 (1983) (noting that a ministerial act is one "regarding which nothing is left to discretion" (citation omitted)); see also *State v. Forte*, 159 Vt. 550, 555 (1993) (duty must be "simple and definite") (citation omitted)). OPC's review is not simple, definite, and free of discretion.

11

The function of a writ of prohibition "is to prevent the unlawful assumption of jurisdiction, either of the entire subject matter or of something collateral or incidental thereto, contrary to common law or statutory provisions." *Pet. of Raymo*, 121 Vt. 246, 248 (1959). It obviously does not apply here.

With no apparent entitlement to review in the nature of certiorari, mandamus, or prohibition, Intralot would appear to have exceptionally little likelihood of success on the merits of the Rule 75 case, much less a likelihood strong enough to warrant a stay of the procurement process.

Even if Intralot were somehow entitled to the *record review* that both parties evidently think it is, Intralot's path to success on the merits is dim at best. The litigation bond requirement in the RFP plainly contemplates coverage for damages, including attorney fees, suffered by the State in a case filed by Intralot if the State is the "prevailing party." The bond actually provided by Intralot drastically limits that "prevailing party" standard to the unlikely circumstances of frivolity, bad faith, and a lack of "reasonable grounds." The bond requirement is not ambiguous. Intralot's third condition violates it materially. If Intralot truly was uncertain of its requirements, it had resort to OPC's express rejection of precisely such a limitation proposed by a different bidder and made known to all.

Intralot's argument that the bond conditions were not mandatory relies extravagantly on the word "may" in the requirement. In context, the requirement plainly reads that the State "may" make a claim on the bond, meaning that it will have discretion as to whether to make a claim on the bond. The requirement cannot reasonably be read to mean that the bidder may include any conditions it likes or that it may drastically limit the State's ability to make claims on the bond. Otherwise, the requirement says the bidder "must" provide a litigation bond, and then goes on to describe its essential characteristics. Intralot simply did not submit such a bond.

There also is no apparent basis for any equitable estoppel or waiver. Intralot makes much of the fact that it submitted a similarly noncompliant bond in response to the previous RFP and OPC did not disqualify it on that basis. Then, when it submitted the bond in response to the current RFP, OPC accepted that its bond had been submitted without initially objecting that it was noncompliant. None of these or related arguments are predicated on any evidence that OPC ever affirmatively represented that the noncompliant bond condition was acceptable under either RFP or gave Intralot any reasonable basis for so believing. Getting away with submitting a noncompliant bond under the first RFP did not authorize Intralot to do the same under the second.

Finally, Intralot's argument that its bond, even if noncompliant, should not result in disqualification does not reflect a fair reading of the RFP and otherwise is at war with the breadth of OPC's discretion. The RFP is not reasonably read to insulate the provision of a compliant bond from OPC's discretion to determine that a failure to do so will result in disqualification.

12

There is no apparent basis for review under Rule 75 in this case. Even if review were conducted as the parties apparently contemplate, Intralot has exceptionally little likelihood of success on the merits.

*Irreparable injury*

Intralot has not specifically identified any irreparable injury that it would suffer if the stay is not granted other than by general reference to its arguments about injury in support of its motion for a preliminary injunction in the equal protection case. In that case, it claims an intrinsic injury due to a constitutional violation as well as the loss of an abstract right to fairly compete regardless of who the contract may be awarded to. Neither are at issue in this case.

Presumably, if Intralot were to go on to win relief in this case, it would be entitled to some kind of remand or modification of the disqualification decision that could be enforced, if necessary, with further coercive orders. See V.R.C.P. 75(d) ("The judgment of the court shall affirm, reverse, or modify the decision under review as provided by law."). However, as the court has said, if the contract was let in the meantime, some injury presumably would accrue to Intralot as, by then, it could not have the opportunity to win the contract.

Nevertheless, any such showing in this case is insufficient to warrant a stay in light of the unlikelihood of success on the merits. The motion to stay is denied for these reasons. It is unnecessary to address the other factors.

*Motion for Preliminary Injunction*

In the equal protection case, Intralot claims that the RFP was designed to deprive Intralot of the right to fair competition for the contract. Importantly, it has consistently claimed that its injury is the inability to fairly compete, and that this injury will occur regardless of who wins the contract and, indeed, even if it were to win the contract. Thus, it claims some enforceable right, complete in itself, to fair competition for a State contract. It seeks a preliminary injunction to maintain the status quo while it attempts to persuade the court to order OPC to redesign the RFP to correct the unfairness Intralot perceives.

The court denies this request for a preliminary injunction. Intralot's unlikely path to success on the merits in the disqualification case means that it is highly likely that Intralot's status now is not even that of an active bidder. The bond requirement that led to its disqualification is not one of the requirements that it had claimed was unfair in this case.

As the Vermont Supreme Court has summarized:

"A preliminary injunction is an extraordinary remedy never awarded as of right." In each instance, we "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." The movant bears the burden of establishing that the relevant factors call for imposition of a preliminary injunction. The trial court here rightly identified the main factors guiding its review under Vermont law: (1) the threat

13

of irreparable harm to the movant; (2) the potential harm to the other parties; (3) the likelihood of success on the merits; and (4) the public interest.

*Taylor v. Town of Cabot*, 2017 VT 92, ¶ 19, 205 Vt. 586 (citations and footnote omitted). "An injunction is an extraordinary remedy, the right to which must be clear." *Okemo Mountain, Inc. v. Town of Ludlow*, 171 Vt. 201, 212 (2000).

### *Irreparable harm*

All else being equal, irreparable harm is not impossible in this case. That is, the loss of the opportunity to bid on a valuable contract would not likely be susceptible to a meaningful compensatory damages remedy once the contact is let to another entity. Any harm caused a deprivation to Intralot's claimed right to compete fairly is, on its own, however, highly abstract. Although the court declines to revisit its preliminary standing and exhaustion decisions, the court notes that the likelihood is that Intralot's disqualification will stand, and thus it no longer has the status of a bidder. There is no chance of irreparable harm, or any harm at all, in that event.

### *Likelihood of success on the merits*

Intralot's class-of-one equal protection claim is not only novel in Vermont, it clashes with the bedrock principle that "[p]rocurement laws are for the benefit of the state, not prospective bidders." *Hinesburg Sand & Gravel Co. v. State*, 166 Vt. 337, 343 (1997). Courts that have considered such class-of-one claims generally have rejected them. "A class-of-one claim is stated when a plaintiff alleges that a defendant intentionally treated [it] differently from others who are similarly situated and that no rational basis existed for the difference in treatment." *Higgins Electric, Inc. v. O'Fallon Fire Protec. Dist.*, 15-1222, 813 F.3d 1124, 1129 (8th Cir. 2016). This type of claim generally does not apply in the procurement setting where bids are submitted based on neutral criteria because the agency is acting in a proprietary capacity and discrimination is the nature of the enterprise. *Id.* at 1129–30; see also *Corey Airport Services, Inc. v. Clear Channel Outdoor, Inc.*, 682 F.3d 1293, 1297 n.2 (11th Cir. 2012); cf. *U.S. v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (explaining that "the class-of-one theory is better suited to those contexts involving 'a clear standard against which departures, even for a single [individual], could be readily assessed'"). Intralot has not come forward with any clear authority to the contrary.

Moreover, Intralot's evidence has simply fallen short. The RFP applied the same to all bidders. There has been no clear showing of any material animus, that Intralot was singled out to lose in the crafting of the RFP (or that any other bidder was singled out to win), or that the specific provisions to which Intralot objects lack any conceivable rational basis. Intralot's allegations have far outrun the evidence. Based on the evidence presented so far, Intralot has little likelihood of success on the merits.

### *Harm to other parties and public interest*

The court also considers that further delay negatively affects Scientific Games, which is awaiting the award to move forward with implementation of the contract. It would suffer harm by issuance of a preliminary injunction.

The court cannot reach a conclusion as to the public interest in either direction. The lottery will go on in any event and it will continue to generate revenue.

Order

For the foregoing reasons:

(1) Intralot's motion for preliminary injunction in the equal protection case (No. 299-9-20 Wncv) is denied;

(2) the temporary restraining order in that case is dissolved; and

(3) the emergency motion for stay of contract award in the disqualification case (No. 339-10-20 Wncv) is denied.

Robert R. Bent,
    Judge

15